**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VERSIE C. CHATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10-cv-04679 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| MORGAN LEWIS & BOCKIUS LLP, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Versie Chatman, who is proceeding *pro se*, was employed as a legal secretary by Defendant, the law firm Morgan Lewis & Bockius LLP ("Morgan Lewis"). Chatman alleges that Morgan Lewis improperly disciplined her and terminated her employment on the basis of her age (she was born in 1955) and race (she is African-American). Chatman further alleges that Morgan Lewis paid her less because of her race, subjected her to a hostile work environment, engaged in unlawful retaliation after she complained of the unlawful discrimination, and violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Morgan Lewis has filed a motion for summary judgment (the "Motion"). (Dkt. No. 90.) For the reasons set forth below, the Court grants the Motion in its entirety.

**I.      PROCEDURAL POSTURE**

Chatman filed her initial complaint in this action on July 27, 2010. The Court granted her leave to file an amended complaint, and she subsequently filed what she styled as her Second Amended Complaint ("SAC"). The SAC asserts the following claims: (i) race discrimination, hostile work environment discrimination, unlawful retaliation, and race discrimination in pay, in violation of 42 U.S.C. § 1981 (Counts I - IV); (ii) race discrimination, hostile work environment discrimination, unlawful retaliation, and race discrimination in pay, in violation of Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et. seq.* (Counts V - VIII); (iii) violations of FMLA (Count IX); and (x) violations of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.* (Count X). Morgan Lewis answered the SAC, and the case proceeded through discovery, which closed on March 22, 2013.

On April 26, 2013, Morgan Lewis filed the Motion, along with supporting materials. Chatman, after missing her deadline to respond and being granted an extension, made a series of filings in opposition to the Motion, which included dozens of duplicative exhibits. (*See generally* Dkt. Nos. 109-132.) But Chatman's memorandum of law in opposition to the Motion failed to cite a single fact in support of her legal arguments. (*See* Dkt. No. 125-1.) And so the Court, on its own motion, granted Chatman leave to supplement her response "in order to cite evidence necessary to cure any procedural defects and comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1." (Dkt. No. 139.) Chatman filed her supplemental response materials (the "Supplemental Filings") three days after the deadline for her to do so, which the Court had already extended upon Chatman's request. (*See* Dkt. Nos. 141-158.) The Supplemental Filings consisted of numerous (at times duplicative) exhibits, several memoranda of law, and other supporting materials.

In light of Chatman's numerous duplicative filings, the Court will consider only the last-filed version of any particular document. These collectively represent the most complete set of Chatman's filings. Accordingly, the Court considers only the arguments and evidence set forth in (1) Chatman's amended supplemental memorandum of law ("Plaintiff's Supplemental Memorandum") (Dkt. No. 158); (2) Chatman's supplemental responses in opposition to Morgan Lewis's Local Rule 56.1 statement of facts ("Plaintiff's Supplemental Responses") and the statement of additional facts set forth therein (Dkt. No. 142-1); (3) the affidavit filed by Chatman

with her supplemental materials ("Plaintiff's Supplemental Affidavit") (Dkt. No. 142-2); and (4) the exhibits that Chatman filed as part of her Supplemental Filings.[1]

## II.    FACTUAL BACKGROUND[2]

### A.    Chatman's Employment with Morgan Lewis – 2006-2009

Chatman began working for Morgan Lewis in its Chicago office on September 1, 2006 as an evening floater secretary. (Def.'s Rule 56.1(a)(3) Statement of Undisputed Material Facts ("SOF" or "Statement of Facts") ¶ 6, Dkt. No. 91.) As an evening floater, Chatman usually worked 1:00-9:00 p.m., although her schedule was subject to minor adjustments for various reasons, including accommodating classes she was taking. (*Id.* ¶ 8.) Chatman's general duties as the evening floater secretary were to support all of the attorneys and paralegals in the Chicago office as secretarial needs arose, particularly after 5:00 p.m. when all other legal secretaries had left for the day. (*Id.* ¶ 9.) Chatman was the only Morgan Lewis employee in the evening floater position. (*Id.* ¶ 49.)[3] All legal secretaries in the Chicago office reported directly to Morgan

---

[1] Morgan Lewis argues that the Court should disregard Chatman's Supplemental Filings on procedural grounds. In particular, Morgan Lewis objects to the untimeliness of these filings. However, in light of Chatman's *pro se* status and the Court's preference to decide cases on the merits rather than on procedural grounds, the Court declines to disregard Chatman's Supplemental Filings. *See Hernandez v. Select Beverages, Inc.*, No. 02-cv-0419, 2002 WL 31307566, at *1 (N.D. Ill. Oct. 10, 2002) ("[B]ecause of the harsh consequences associated with a granting of summary judgment, courts should be 'solicitous of *pro se* plaintiffs' when determining their compliance with procedural requirements and should be wary of terminating 'legitimate lawsuits merely because of unskilled presentations.'") (quoting *Kincaid v. Vail*, 969 F.2d 594, 598-99 (7th Cir. 1992)).

[2] Many of Plaintiff's Supplemental Responses respond "Undisputed," but fail fully and accurately to repeat the corresponding factual statement set forth by Morgan Lewis in its Statement of Facts. The Court interprets such responses as fully admitting the corresponding paragraph of Morgan Lewis's Statement of Facts. Because of the deficiencies in Plaintiff's Supplemental Responses, the Court cites Morgan Lewis's Statement of Facts throughout this opinion except when Chatman disputes the relevant statements, when an admission is especially telling, or when citing an additional fact put forth by Chatman.

[3] Chatman disputes that she was the only person in the evening floater position. (*See* Pl.'s Supp. Resp. to SOF ¶ 49, Dkt. No. 142-1.) However, the evidence cited in paragraph 49 of Chatman's Supplemental Response does not support her disagreement with any portion of paragraph 49 of Morgan Lewis's Statement of Facts; accordingly, the Court deems this paragraph admitted in its entirety. *See Smith v.*

Lewis's Human Resources Manager Chanel Johnson. (*Id.* ¶ 5.)[4] Johnson is African-American and was born in 1973. (*Id.*)

Morgan Lewis was generally pleased with Chatman's performance from 2006 until 2009. All of the written annual reviews received by Chatman prior to August of 2009 included an overall rating of "Fully Meets Expectations" or "Fully Meets."[5] (Def.'s Suppl. Reply to Pl.'s Statement of Additional Facts ("SAF") ¶ 2, Dkt. No. 166.) By Spring 2009, however, Chatman was receiving more critical evaluations of her work: in her April 2009 review, Chatman received an overall rating of "Fully Meets Expectations" (Def.'s SOF ¶ 13, Dkt. No. 91), but the review also included a number of comments critical of Chatman's work. Examples include the following statements:

> For the most part, Versie's work is accurate. However, there were a few occasions this review period when given an assignment outside of her routine responsibilities, Versie did not provide the finished product that the attorneys expected. . . .
>
> There have been some occasions this year where Versie may have been asked to perform more complex revisions or analysis where Versie's work did not fully meet the mark. Taking time to review her work thoroughly and asking more questions up front to ensure a full understanding of the assignment will help ensure that Versie can perform all tasks accurately and meet the expectations of the attorneys. . . .

---

*Lanz*, 321 F.3d 680, 683 (7th Cir. 2003 ("[W]hen a responding party's statement fails to controvert the facts as set forth in the moving party's statement in a manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion"). Furthermore, in her deposition, Chatman admitted that she was the only person who held the position of evening floater secretary while she was employed at Morgan Lewis, and that there was no other full-time employee who could have covered for Chatman while she was on leave. (Def.'s Ex. B, Chatman Dep. Tr. at 262:20-263:6, Dkt. No. 90-2.)

[4] Chatman's Supplemental Responses dispute whether all secretaries at Morgan Lewis's Chicago office reported directly to Johnson. However, her Supplemental Affidavit admits this fact. (Chatman Supp. Aff. ¶ 5, Dkt. No. 142-2.)

[5] Morgan Lewis's review form defines "Fully Meets" as: "Performance consistently meets and may periodically exceed the expectations for the position. Consistently performs all job responsibilities in a comprehensive and satisfactory manner." (Chatman Dep. Ex. No. 44 at D00124, Dkt. No. 90-5.)

She should also try to keep in mind her role in the bigger picture i.e. understand that routine, tedious work is necessary to meet the needs of the lawyers in order for them to provide the highest level of service to firm clients. . . .

(*Id.*)

## B.     August 27, 2009 Performance Counseling Memo

Chatman's relationship with Morgan Lewis began to unravel in August 2009. On August 27, 2009, Johnson gave Chatman a Performance Counseling Memorandum (the "August 2009 Memo") relating to an assignment for which Chatman was asked to assist another secretary, Christine Clarke, in preparing a legal document (the "August 2009 Incident"). (*Id.* ¶ 14.) Clarke is Caucasian and was born in 1959. (*Id.*) The August 2009 Memo states, in part, that the document Chatman prepared "contained a number of spelling errors, formatting issues and inappropriate references to plaintiff's counsel," that Chatman had told Johnson that Chatman did not proof the document because she "assumed it was free of errors," and that Johnson was "concerned that [Chatman] felt the need to have [Clarke] prepare a sample document to use as a guide for the assignment," because "as a legal secretary, [Chatman was] expected to have an understanding of basic legal documents and should have known how to properly prepare" this one. (*Id.* ¶ 15.) Chatman admitted that the legal document she submitted contained errors but insisted that she was simply following Clarke's instructions. (*Id.* ¶ 16.)

Chatman refused to sign the August 2009 Memo in acknowledgement of its receipt and instead submitted to Johnson a written "Answer to Performance Counseling," which made no reference to race or age. (*Id.* ¶ 19.) Chatman also verbally complained to Johnson that she thought it was unfair that she was receiving discipline for this incident when Clarke was not; Chatman perceived this as being "discrimination and unfair treatment," but she did not mention

race during this conversation. (*Id.* ¶ 20.)[6] Chatman also verbally complained to then-managing

Morgan Lewis partner Barry Hartstein that she received discipline for following Clarke's

instructions regarding the August 2009 project but Clarke did not receive discipline. (*Id.* ¶ 21.)[7]

### C.     April 2010 Performance Review

In April of 2010, Johnson gave Chatman her performance review for the prior calendar

year (the "April 2010 Review."). Chatman received an overall rating of "Inconsistent," which

represented a lower rating than the "Fully Meets" overall rating she had received the prior year.

(*Id.* ¶ 22.)[8] The narrative portions of the consensus review also included the following

comments:

> [Versie] is usually able to complete short term needs promptly, but longer term
> assignments i.e. filing and organizational projects, tend to take longer to complete
> than expected. As our evening floater, the bulk of Versie's work begins after 5pm,
> there should be ample time between her start time of 1pm and 5pm for her to
> complete longer term projects. . . .

---

[6] In Chatman's response to Paragraph 20, she disputes that she did not mention race at this time,
supporting this assertion with a citation to "Pl. Ex. 11." No exhibit with that name was filed as part of the
Supplemental Materials; nor do any of Chatman's previously-filed exhibits support her response. Because
Chatman did not support her denial of this fact with admissible record evidence, the Court deems
admitted paragraph 20 of Morgan Lewis's Statement of Facts. *See McGuire v. United Parcel Serv.*, 152
F.3d 673, 675 (7th Cir.1998) ("An answer [to a L.R. 56.1 statement] that does not deny the allegations in
the numbered paragraph with citations to supporting evidence in the record constitutes an admission.").
For the same reason, paragraph 50 is admitted. Furthermore, Chatman's own deposition testimony does
not support the fact that Chatman mentioned race or race-based discrimination at this time. (*See* Def.'s
Ex. B, Chatman Dep. Tr. at 264:22-265:2, Dkt. No. 90-2.).

[7] The parties dispute whether Chatman mentioned race during her meeting with Hartstein. (*Compare*
Def.'s SOF ¶ 21, Dkt. No. 91, *with* Pl.'s Supp. Resp. to SOF ¶ 21, Dkt. No. 142-1.)

[8] The review form defines "Inconsistent" as:

> Overall performance is inconsistent. Although achievements of some objectives are acceptable,
> others require more supervision than normally expected for someone at this level. Performance
> requires attention and improvement in some areas to fully meet requirements; still learning the
> scope of the job. This rating will require an explanation in the corresponding comment box. A
> performance development plan may be required.

(Chatman Dep. Ex. 44 at 1, Dkt. No. 90-5.)

There have been times, however, when she has missed the mark on more complex assignments and/or not taken full ownership of assignments as addressed in a performance counseling memo in August 2009. . . .

There are times, however, when she is hesitant or skeptical when asked to complete certain tasks or assist certain people. . . .

Versie needs to take more ownership and think through assignments and consider how her part of the assignment fits into the big picture. Versie tends to only follow instructions rather than think through an assignment and ask questions when necessary. . . .

[Versie] needs to work on ensuring that she is able to meet the non-routine, more complex work that typically arises during the workday. . . . To gain the confidence of the attorneys, Versie needs to use her time more efficiently and be more responsive, knowledgeable, efficient and consistent in the quality of her work.

(*Id.*)

On April 23, 2010, Chatman filed with the Equal Employment Opportunity Commission (the "EEOC") Charge of Discrimination No. 440201003718 (the "EEOC Charge"), alleging race and age discrimination and claiming she had "been subjected to increasing harassment and biases." (*Id.* ¶ 10.) On April 28, 2010, the EEOC issued a right to sue letter. (*Id.*)

**D.      June 2010 Performance Counseling Memorandum**

On May 27, 2010, Chatman sent an email of approximately four single-spaced pages to Brandy Norman, another Morgan Lewis secretary, and copied approximately 18 other people, including Johnson, two staff members, and all Chicago legal secretaries. (*Id.* ¶ 24.) She sent the same four-page email to the same group of individuals again on June 1, 2010. (*Id.*). Chatman intended these emails as a response to an email Norman had sent Chatman—and only to Chatman—on March 19, 2010. (*Id.*) Norman is an African-American woman who was born in 1979. (*Id.*)

On June 14, 2010, Johnson gave Chatman a Performance Counseling Memorandum (the "June 2010 Memo") relating to the sending of inappropriate emails on May 27 and June 1, "which on both occasions, was disruptive to the office." (*Id.* ¶ 25.) The June 2010 Memo further noted that "[d]istributing this email twice to 17 people is an inappropriate use of the Firm's email systems and is indicative of your inability to handle difficult situations effectively. It also demonstrates a lack of judgment, an area which has been discussed with you [on three occasions]." (*Id.*) Chatman refused to sign the Performance Counseling Memorandum in acknowledgement of its receipt, and instead submitted to Johnson a written response memorandum. (*Id.* ¶ 26.) Chatman's response memorandum does not mention or otherwise reference race or age. (*Id.*)

On June 20, 2010, Chatman also submitted to Sue Suchy, Morgan Lewis's Director of Administration, a memorandum complaining about Johnson's actions with respect to the August 2009 Memo, the April 2010 Review, and the June 2010 Memo. (*Id.* ¶ 27.) Chatman's memorandum did not mention or otherwise reference race. (*Id.*) Suchy referred Chatman's request for an investigation into Johnson's actions to Marie O'Donnell, Morgan Lewis's Director of Human Resources. (*Id.* ¶ 28.) After investigating Chatman's complaints, O'Donnell emailed Chatman that, as a result of her investigation, O'Donnell "could find no evidence that anyone was or is manipulating the records or taking steps to harass or retaliate against you." (*Id.* ¶ 30.)

**E.      December 14, 2010 Final Warning Memo**

On the afternoon of December 1, 2010, Chatman sent an email to all secretaries offering assistance, and Morgan Lewis secretary Rita Newell responded with an email requesting assistance "as soon as possible." (*Id.* ¶ 31.) Newell is African-American and was born in 1960. (*Id.*) Chatman never responded to Newell's email. (*Id.* ¶ 32.) The following afternoon, Newell

confronted Chatman in the office and asked Chatman why she had not responded to Newell's request for help. (*Id.* ¶ 32.) Newell also sent Chatman an email asking why Chatman never responded and asking "if in the future, you could just let me know if you can assist me or not." (*Id.*) Chatman called Johnson on December 2, 2010 to complain about Newell's behavior. (*Id.* ¶ 33.) Chatman then sent an email to Johnson with the subject "Taking advantage," in which she complained, in part, "[s]ome of these secretaries are doing it again. . . . they are taking advantage and giving me work they do not want to do. . . . [Clarke] and [Newell] are the two secretaries who really take advantage of that. . . . they are taking advantage of my emails for help with work they do not want to do." (*Id.*)

Johnson investigated Chatman's allegations and, after reviewing the email exchanges between Newell and Chatman and talking to them, determined that Chatman was complaining about getting assigned work that was within her expected responsibilities. (*Id.* ¶ 34.) Johnson had previously determined that other complaints by Chatman regarding her coworkers were baseless or inappropriate. (*Id.* ¶ 35.) On December 14, 2010, Johnson presented Chatman with a confidential memo entitled "Response to Complaint and Final Warning" (the "Final Warning"), which stated, in part:

> The purpose of this memorandum is to (1) address your newest complaint that they [*sic*] other secretaries are "taking advantage" of you by requesting your assistance in the office; (2) place you on notice that these continued baseless complaints are disruptive and must stop and (3) place you on a Final Warning.

(*Id.* ¶ 36.)

On December 14, 2010, Chatman sent an email to Johnson and Suchy with a memo entitled "Meeting/Back Injury/Retaliation" in which Chatman complained about and responded to the Final Warning. (*Id.* ¶ 38.) Her email and memo did not mention or otherwise reference age. (*Id.*)

**F.     Chatman's FMLA Leave and Illinois Department of Human Rights Charges**

Beginning in May 2010, Chatman began a period of intermittent FMLA leave pursuant to Morgan Lewis's Family and Medical Leave Policy (the "FMLA Policy"). The FMLA Policy was designed to be consistent with FMLA, and provided that an "eligible employee is entitled to a total of up to 12 weeks of family and medical leave in a 12-month period for the basic leave entitlement, measured on a rolling basis and backwards from the date the leave in question begins." (*Id.* ¶ 39.)

Chatman requested, and Morgan Lewis granted, a leave of absence due to stress beginning May 27, 2010 and extending through June 11, 2010. (*Id.* ¶ 41.) Chatman then requested and was granted a leave of absence from June 16, 2010 through July 19, 2010 due to stress and lower back pain. (*Id.* ¶ 42.) On December 14, 2010, Chatman went to work but left within the first two hours of her shift, unable to work because she was experiencing back pain. (*Id.* ¶ 43.) Chatman then requested and was granted a leave of absence from December 14, 2010 through December 31, 2010 due to back pain. (*Id.* ¶ 44.) Chatman returned to work on January 3, 2011, but left within two hours of her arrival because she was again having back problems. (*Id.* ¶ 45.) Chatman then requested and was granted a leave of absence from January 3, 2011 through March 7, 2011. (*Id.* ¶ 46.) For each of these periods, Morgan Lewis provided Chatman with written notice that the leave would be designated as leave under FMLA. (*Id.* ¶¶ 41, 42, 44, 47.)

Morgan Lewis informed Chatman in a letter dated January 14, 2011 that the period of leave between January 3, 2011 and January 18, 2011 would be designated as FMLA leave, but "[s]ince your request for leave is scheduled to extend beyond the statutory job protection time period, your leave after January 18, 2011 is not protected and the Firm cannot guarantee your

return to employment." (*Id.* ¶ 47.) On January 21, 2011, Morgan Lewis posted the Evening Legal

Floater Secretary position and began interviewing potential candidates. (*Id.* ¶ 52.)

After a visit to her doctor on March 1, 2011, Chatman requested that Morgan Lewis

extend her leave of absence through May 7, 2011 due to back pain. (*Id.* ¶ 48.) On March 24,

2011, Chatman filed Charge of Discrimination No. 2011CA2828 with the Illinois Department of

Human Rights ("IDHR") alleging that the Final Warning was issued because of Chatman's age

and physical disability (back disorder), and in retaliation for filing her EEOC Charge. (*Id.* ¶ 11.)

On March 28, 2011, Johnson offered Chatman's former position as Evening Legal

Floater Secretary to Rochelle Blanchard, who immediately accepted the offer. (*Id.* ¶ 53.)

Blanchard, an African-American woman born in 1961, started work in the Chicago office on

April 4, 2011 and was still employed by the Firm in the same position through at least April

2013. (*Id.*) On April 13, 2011, Johnson sent Chatman a letter stating, in part:

> As explained to you in previous letters in connection with your leave of absence,
> your FMLA leave entitlement was exhausted as of January 18, 2011. Since your
> leave has extended beyond the FMLA statutory job protection period and business
> needs required us to fill your position, the decision was made to start actively
> recruiting to replace you. At this time, the evening legal secretary position has
> been filled and is no longer open.

(*Id.* ¶ 54.)

On April 28, 2011, Chatman emailed Johnson an updated application for short-term

disability completed by her doctor and informed Johnson that her doctor was now estimating that

she would not be able to return to work until at least August 1, 2011. (*Id.* ¶ 56.) On April 29,

2011, Johnson and O'Donnell, after consulting with counsel, decided to terminate Chatman's

employment. (*Id.* ¶ 57.) That same day, Johnson sent Chatman a letter acknowledging receipt of

her most recent short-term disability application and informing Chatman, in relevant part:

As we explained to you in a letter dated April 13, 2011 the evening legal secretary position has been filled. At this time, there are no open positions for which you are qualified, and we do not expect that to change by the time your doctor releases you to return to work. Therefore, we have no choice but to terminate your employment with us as of today. However, when you are released to return to work, please feel free to contact us to inquire as to whether there are any available positions for which you might be qualified.

(*Id.* ¶ 58.)

On May 24, 2011, Chatman filed Charge of Discrimination No. 2011CA3461 with the IDHR, alleging that she had been discharged in April 2011 because of her age, race, and physical disability (back disorder), and in retaliation for filing her EEOC Charge and the IDHR charge that she filed on March 24, 2011. (*Id.* ¶ 12.)[9]

## III. DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 324. A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216

---

[9] Chatman ultimately withdrew both IDHR charges. (Def.'s SOF ¶¶ 11-12, Dkt. No. 91).

F.3d 596, 599 (7th Cir. 2000). The Court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

A.     **Race and Age Discrimination Claims (Counts I, IV, V, VIII, and X)**

Title VII makes it illegal "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of race. 42 U.S.C. § 2000e–2(a). Similarly, ADEA makes it unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a). As explained further below, a plaintiff suing under either Title VII[10] or the ADEA may show discrimination directly or indirectly, in the latter instance through the approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (*McDonnell Douglas* indirect method of showing discrimination applies in ADEA cases).

The direct method requires a plaintiff to offer evidence of either an "outright admission by the decisionmaker that the challenged action was undertaken because of" the plaintiff's race or age; or a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations and citations omitted). Chatman does not identify any direct evidence of discrimination on the basis of her age or race, and thus the Court

_____

[10] Claims brought under § 1981 are analyzed under the same framework as claims brought pursuant to Title VII. *Bratton v. Roadway Package Sys.*, 77 F.3d 168, 176 (7th Cir. 1996).

assumes she is proceeding solely according to the indirect method of proof. *See Rai v. Dynagear*, No. 98-cv-6053, 2000 WL 875401, at *11 (N.D. Ill. June 26, 2000).

Under the indirect method, the plaintiff carries "the initial burden under the statute of establishing a *prima facie* case of . . . discrimination." *McDonnell Douglas*, 411 U.S. at 802. To establish a *prima facie* case, a plaintiff must offer evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). Failure to satisfy any one element of the *prima facie* case is fatal to an employee's employment discrimination claim. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006). Once a *prima facie* case is established, a presumption of discrimination is triggered and the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802; *Burks*, 464 F.3d at 751. If the employer is able to do so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Burks*, 464 F.3d at 751.

Chatman identifies a number of employment actions that she claims were discriminatory on the basis of her race or age: (1) the August 2009 Memo, which according to Chatman led to her not receiving a raise in 2010; (2) the Final Warning memo; (3) Morgan Lewis's application of FMLA and, consequentially, Chatman's termination; and (4) unequal pay. For the reasons set forth below, the Court finds that Chatman has failed to establish triable issues of fact for any of

these alleged instances of discrimination, and grants summary judgment to Morgan Lewis on Counts I, IV, V, VIII, and X.

### 1.    August 2009 Memo and Denial of Raise

Chatman argues that the August 2009 Memo and subsequent denial of a raise constituted unlawful discrimination. She bases this claim on the fact that Clarke, "[t]he white secretary[,] was not reprimanded." (Def.'s SOF ¶ 17, Dkt. No. 91.)[11] Chatman also argues that receiving the August 2009 Memo resulted in her not receiving a raise in 2010, while Clark did receive a raise that year. (Pl.'s Supp. Mem. at 4, Dkt. No. 158.) According to Chatman, these facts allow her discrimination claim to survive summary judgment.

Chatman does not dispute that there were errors in the document she prepared in the August 2009 Incident; rather, she claims that she was disciplined more harshly than Clarke due to her race. Because Chatman claims that she was subject to disparate punishment, the second and fourth prongs of the *McDonnell Douglas* framework merge. *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002); *Flores v. Preferred Technical Grp.*, 182 F.3d 512, 515 (7th Cir. 1999). In a disparate punishment case, "there is no question that the employee failed to meet his employer's expectations. Instead, the plaintiff must establish that [s]he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). Thus, in order to make out her *prima facie* case under *McDonnell Douglas*, Chatman must show that she was subject to an adverse employment action and that she was subject to harsher discipline than Clarke despite the two of them being similarly situated.

---

[11] Chatman disputes ¶ 17 of Morgan Lewis's Statement of Facts, claiming that "with respect to Chatman's deposition, Chatman did not say the basis for her belief." (Pl.'s Supp. Resp. to SOF ¶ 17, Dkt. No. 142-1.) However, the only evidence Chatman cites in support of this contention is her own deposition, which in fact supports Morgan Lewis's position.

Chatman has not established that Clarke is a proper comparator. In disciplinary cases, the inquiry typically involves showing that employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 689 (7th Cir. 2007) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). Here, Chatman does not dispute that Johnson investigated the causes of the August 2010 Incident, including reading the emails exchanged between Chatman and Clarke regarding the project. (Pl.'s Supp. Resp. to SOF at ¶ 18, Dkt. No. 142-1.) It is also undisputed that Johnson did not believe Clarke had provided improper instructions to Chatman. (*Id.*) The undisputed evidence also shows that, even if the instructions were incomplete in some way, Johnson believed that Chatman should have known how to handle the legal document in question without explicit detailed instructions and should have proofread the document before she submitted it to the supervising attorney in any event. (*Id.*) These undisputed facts constitute differentiating or mitigating circumstances that make Clarke an improper comparator for the *McDonnell Douglas* analysis. Accordingly, Chatman has failed to establish a *prima facie* case of discrimination with respect to the August 2009 Memo and subsequent denial of a raise.

### 2. Final Warning Memo

In her deposition, Chatman testified that she believed age was a factor in her receiving the Final Warning memo because Johnson is younger than Chatman. (Def.'s SOF at ¶ 37, Dkt. No. 91.)[12] But in the discrimination context, the Final Warning memo cannot, standing alone, serve as a materially adverse employment action. For an action to be materially adverse, it must

---

[12] Chatman disputes that she "believes Johnson gave her the [Final Warning] because of Chatman's age based solely on the reason that Johnson is younger." (Pl.'s Resp. to SOF ¶ 37, Dkt. No. 142-1.) However,

'[be] more than a mere inconvenience or an alteration in job responsibilities.' . . . Rather, the employee must be able to show a quantitative or qualitative change in the terms of conditions of employment, such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation.'

*Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 612-13 (7th Cir. 2001) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Because Chatman has cited no evidence that the Final Warning memo caused any change in the terms of conditions of her employment with Morgan Lewis, she has failed to make out a *prima facie* case of employment discrimination with respect to the Final Warning memo. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions."); *Oest*, 240 F.3d at 612-13 (finding that written reprimands received under progressive discipline policy were not adverse employment actions).

### 3.     FMLA and Termination

Chatman also claims that she was discriminated against, and ultimately terminated, due to Morgan Lewis's discriminatory application of the FMLA Policy. According to Chatman, there are two potential comparators for purposes of the *McDonnell Douglas* analysis: Clarke and Kimberly Karpavicius. According to Chatman, Clarke and Karpavicius were given more lenient treatment under the FMLA Policy because they are Caucasian. Chatman claims that as a result of this disparate treatment, she was terminated after exceeding the 12 weeks of leave allowed under the FMLA Policy, while Clarke and Karpavicius were not terminated despite taking more time than was allotted to them. (Pl.'s Supp. Mem. at 5-7, Dkt. No. 158.)

---

the only evidence Chatman cites to support this denial are portions of her own deposition transcript, in which she testified that she did not recall any other reason that she believes Johnson issued the Final Warning on the basis of Chatman's age. (Def.'s Ex. B, Chatman Dep. Tr. at 33:12-34:1, Dkt. No. 90-2).

Chatman cannot prevail on this claim for the reason that Clarke and Karpavicius are not similarly situated to her. A similarly situated employee must be similar "in all material respects." *Peele v. Country Mut. Ins., Co.*, 288 F.3d 319, 330 (7th Cir. 2002). There must be a substantial similarity so as to create the inference that discriminatory intent is the reason for differing treatment. *Spath v. Hayes Wheels Int'l*, 211 F.3d 392, 397 (7th Cir. 2000). Here, however, the undisputed facts show that there were material differences between Chatman, on the one hand, and Clarke and Karpavicius, on the other. Clarke and Karpavicius were day-shift secretaries. (Def.'s SOF ¶¶ 3, 62, Dkt. No. 91.) Due to the fact that there were between 15 and 18 day-shift legal secretaries, Morgan Lewis was able to shift staffing resources to accommodate Clarke and Karpavicius's non-FMLA-protected absences. (*Id.* ¶¶ 2, 3, 49, 63, 68.) In contrast, Chatman was the only person in the evening floater position. (*Id.* ¶¶ 3, 49.)[13] Moreover, the undisputed evidence shows that Chatman's continued leave caused a hardship for Morgan Lewis: because Chatman was the only evening floater legal secretary in Morgan Lewis's Chicago office, during Chatman's FMLA leaves, the firm was forced either to have a day-shift secretary stay later into the evening—incurring overtime pay—or was unable to provide evening coverage for its attorneys and other legal staff. (*Id.* ¶¶ 49-50.) Because of this material difference between Chatman and the secretaries she holds out as comparators, the latter cannot serve as similarly

---

[13] Chatman disputes that she was the only secretary assigned to the evening floater position while all other secretaries worked daytime hours. (Pl.'s Supp. Resp. ¶ 3, Dkt. No. 142-1.) She cites evidence that she claims establishes that Clarke "worked the evening secretarial shift." (Pl.'s Supp. Aff. ¶ 27, Dkt. No. 142-2.) However, the evidence to which Chatman cites indicates only that Clarke worked for several weeks after June 14, 2010 on a 3:00 p.m. to 7:00 p.m. schedule and was available during this time "to assist with overflow afternoon/evening needs" during this time period. (Pl.'s Supp. Ex. 26 at 1, Dkt. No. 144.) Because Clarke was not available for overflow assistance at the time of Chatman's termination, Chatman's denial is not supported by the cited record, and the Court deems paragraph 3 of Morgan Lewis's Statement of Facts admitted. *See McGuire*, 152 F.3d at 675. Furthermore, in her deposition, Chatman admitted that she was the only person who held the position as evening floater secretary while she was employed at Morgan Lewis, and that consequently there was no other full-time employee who could have covered for her while she was on leave. (Def.'s Ex. B, Chatman Dep. Tr. at 262:20-263:6, Dkt. No. 90-2.)

situated employees for Chatman's discrimination claim based on Morgan Lewis's application of the FMLA Policy. Furthermore, even if the Court were to find that Karpavicius and Clarke were similarly situated employees and Chatman made out a *prima facie* case of discrimination under the indirect method, Morgan Lewis has articulated a legitimate business reason for terminating Chatman—the expiration of Chatman's FMLA time and Morgan Lewis's need for having a regularly scheduled evening floater secretary.

Chatman cites evidence of dissembling by Morgan Lewis in an attempt to show pretext and salvage her discrimination claim. Chatman cites deposition testimony from Suchy indicating that Chatman was fired for poor performance, rather than for the FMLA-related business reasons articulated by Johnson. (Pl.'s Supp. Ex. 71, Suchy Dep. at 4:9-14, Dkt. No. 157.) Suchy further testified that she was not involved in the decision to terminate Chatman (*id.* at 4:15-23), but this is contradicted by Johnson's testimony that Suchy was involved in the decision. (Pl.'s Supp. Ex. 13, Johnson Dep. at 47:18-48:13, Dkt. No. 153.) These apparent discrepancies in testimony cannot save Chatman's claim from summary judgment however, because Chatman has failed to adduce any evidence indicating that they hide an unlawful purpose. *See Reeder-Baker v. Lincoln Nat. Corp.*, 834 F.2d 1373, 1377 (7th Cir. 1987) ("The employee . . . bears the burden not only of persuading the trier of fact that the employer dissembled, but also that the employer's pretextual reason hides an unlawful one."). Further, it is significant that Blanchard, Chatman's successor, was an African-American woman who is only six years younger than Chatman. (Def.'s SOF at ¶ 53, Dkt. No. 91.) Blanchard's status as a protected class member under both Title VII and the ADEA is not determinative of Chatman's claim that she was discharged because of impermissible racial considerations, but it does suggest that the expiration of Chatman's protected FMLA time was not merely a ruse for discharging Chatman based on her protected

characteristics. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1118 n.50 (7th Cir. 1992); *see also Fisher v. Wane Dalton Corp.*, 139 F.3d 1137, 1141 (7th Cir. 1998) (less than 10 year difference in age is "presumptively insubstantial" under the ADEA).

### 4. Race Discrimination in Pay (Counts IV and VIII)

Counts IV and VIII of Chatman's SAC state claims for race discrimination in pay under Title VII and 42 U.S.C. § 1981. However, at her deposition Chatman testified that she was no longer asserting a claim in this case that her pay was somehow discriminatory. (Def.'s SOF ¶ 75, Dkt. No. 91.)[14] In her Supplemental Memorandum, Chatman denies that she withdrew these claims, but fails to cite any evidence that affirmatively supports her pay discrimination claims. Accordingly, summary judgment is granted with respect to counts IV and VIII.

### B. Retaliation Claims (Counts III and VII)

Chatman also claims that Morgan Lewis engaged in unlawful retaliation against her on several separate occasions. As with claims of discrimination, there are two distinct ways in which a plaintiff may establish a *prima facie* case for unlawful retaliation: the direct method or the indirect method. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). The indirect method is a burden-shifting test similar to the one employed in *McDonnell Douglas*, and requires the identification of a similarly situated employee who did not engage in statutorily protected activity. *See Nichols*, 510 F.3d at 785; *Haywood*, 323 F.3d at 531. Because Chatman does not

---

[14] In her Supplemental Response, Chatman disputes that she testified in this manner (Pl.'s Supp. Resp. to SOF ¶ 75, Dkt. No. 142-1), but cites only her own Supplemental Affidavit, which in turn cites back to her deposition transcript. (Pl.'s Supp. Aff. ¶ 81, Dkt. No. 142-2.). The Court's review of the deposition testimony reveals that Chatman indeed testified that she had no claim that her pay was discriminatory. (*See* Def.'s Ex. B, Chatman Dep. Tr. at 156:2-8, Dkt. No. 90-2.)

identify a similarly situated employee for any of her claimed instances of retaliation, she must rely on the direct method of proof.

Under the direct method of proof, a plaintiff must offer either direct or circumstantial evidence that: (1) she engaged in a statutorily protected activity; (2) the defendant subjected her to an adverse employment action; and (3) a causal connection exists between the two events. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). "[D]irect evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). Chatman cites no direct evidence, and thus must rely on circumstantial evidence. Circumstantial evidence may include such things as suspicious timing, ambiguous statements, behavior towards other employees, and unfavorable treatment compared to similarly situated employees. *See Volovsek v. Wis. Dep't Agric. Trade & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003).

Chatman first claims that Morgan Lewis downgraded her overall performance review from "Fully Meets Expectations" in Spring 2009 to "Inconsistent" in Spring 2010 as retaliation for internal complaints she made regarding what she perceived as race- and age-based discrimination in the wake of the August 2009 Incident.[15] (Pl.'s Supp. Mem. at 4, 7-8, Dkt. No. 158.) In the retaliation context, "'[m]aterially adverse actions' are those that might dissuade a reasonable employee from engaging in protected activity . . . ." *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011). A negative performance evaluation may constitute an adverse employment action. *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 741 (7th Cir. 2011). However, Chatman cannot establish a causal relationship between the Spring 2010

---

[15] The parties dispute whether Chatman mentioned race as part of her internal complaints. *See supra* at note 6. Although this fact would be material in terms of whether Chatman engaged in a statutorily protected activity, it is not determinative in light of other deficiencies in Chatman's retaliation claims.

Review and her complaint regarding the August 2009 Incident. The only evidence Chatman cites in support of such a connection is that "after Chatman oppos[ed] discrimination . . . Chatman was retaliated against." (Pl.'s Supp. Mem. at 4, Dkt. No. 158.) However, "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see also Burks*, 464 F.3d at 758-59 (explaining that "suspicious timing alone . . . does not support a reasonable inference of retaliation" because the "mere fact that one event preceded another does nothing to prove that the first event caused the second") (citation omitted). This is not one of the rare occasions in which temporal proximity will create a disputed issue of material fact. Approximately eight months elapsed between these two events. That amount of time by itself is too great to establish an inference that there was a causal connection. *See, e.g., Benuzzi*, 647 F.3d at 666 (two-month time frame between filing of EEOC complaint and suspension is, without more, insufficient to give rise inference of causal relationship); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval between sexual harassment complaint and termination does not give rise to inference of causation).

Chatman's other retaliation claims fail for the same reason. She claims that her receipt of the Final Warning memo on December 14, 2010 was in retaliation for her "filing additional complaints with the Federal Court on November 5, 2010." (Pl.'s Supp. Mem. at 8, Dkt. No. 158.) But again Chatman fails to establish a causal connection between these two events, as she does not cite any evidence that these two events are related other than their temporal proximity.[16]

---

[16] The November 5, 2010 event cited by Chatman was actually a motion to amend her complaint. The original complaint was filed in July of 2010. (*See* Dkt. Nos. 1, 15.) Chatman's assertion that there is a causal connection between the filing of a motion to amend her complaint and the Final Warning memo

*Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) (plaintiff's termination "three weeks after a complaint, by itself, is not sufficient to create a genuine issue of material fact to support a retaliation claim"). Finally, Chatman's claim that her termination in April 2011 was in retaliation for filing her March 2011 IDHR Complaint also fails, as Chatman fails to cite any evidence of a causal connection except for the temporal proximity between these two events. (Pl.'s Supp. Mem. at 9, Dkt. No. 158.) Again, this span of time is insufficient to create a genuine issue of material fact to support a retaliation claim. *See Povey*, 697 F.3d at 624.

### C.      Hostile Work Environment Claims (Counts II and VII)

To prove her hostile work environment claims, Chatman must show: (1) that her work environment was subjectively and objectively offensive; (2) that the harassment was based on race; (3) that the conduct was so severe or pervasive to create a hostile work environment; and, (4) that there is a basis for employer liability. *See Erickson v. Wis. Dept. of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006). An objectively offensive workplace environment is typically determined by the frequency and severity of the conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the plaintiff's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[T]he environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Curry v. City of Chi.*, No. 10 CV 8241, 2013 WL 1283477, at *7 (N.D. Ill. 2013) (quoting *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004)).

---

two is even less compelling given that Morgan Lewis had been on notice of the lawsuit for some five months prior to issuing the Final Warning memo.

At her deposition, Chatman testified that she believed she was racially harassed at work by Johnson, Newell, and Norman. (Def.'s SOF ¶ 71, Dkt. No. 91.)[17] According to Chatman, Norman harassed her by sending a "hostile e-mail" and also was confrontational and "would initiate things." (Def.'s Ex. B, Chatman Dep. Tr. at 124:2-127:8, Dkt. No. 90-2.) Chatman also portrays Norman's "ill-mannered way of treating" Chatman and "talking down to" Chatman as harassment. (*Id.* at 128:2-5.) Furthermore, Chatman claims that Newell harassed Chatman by "holler[ing] and scream[ing]" at her "because of a document," and asserts that Newell "wouldn't have hollered and screamed at a white secretary like that." (*Id.* at 129:19-130:20.) In her Supplemental Memorandum, Chatman cites a number of other incidents in an attempt to buttress her hostile work environment claim:

- Morgan Lewis secretary Elizabeth Chapman "snatched [Chatman's] job off the printer while [Chatman] was standing there and threw it at [Chatman];"

- Chapman "stormed by [Chatman] hastily, looking at [Chatman], and rolling her eyes at [Chatman];"

- an email from a Morgan Lewis attorney referring to "something going on here between [Norman] and [Chatman]" and referring to the negative tone of certain emails between the two; and

- an email from Johnson to Suchy referring to two secretaries "gang[ing] up on Versie."

(Pl.'s Supp. Mem. at 13-14, Dkt. No. 158.)

As a threshold matter, Chatman fails to cite evidence that any of this activity was based on her race or age. The closest Chatman comes to identifying evidence of harassment due to these protected characteristics is her deposition testimony speculating that Newell "wouldn't

---

[17] In her Supplemental Response, Chatman disputes this proposition as follows: "Disputed with respect to Chatman believed she was racially harassed at work by Johnson and African American secretaries Rita Newell and Brandy Norman. The deposition numbers Defendants gives [*sic*] do not indicate this." (Pl.'s Supp. Resp. to SOF ¶ 71, Dkt. No. 142-1.) Because the Court's review of the cited material reveals that Morgan Lewis's statement is accurate, and Plaintiff does not cite contradictory evidence, the Court deems paragraph 71 of Morgan Lewis's Statement of Facts admitted.

have hollered and screamed at a white secretary," (Def.'s Ex. B, Chatman Dep. Tr. at 129:19-130:20, Dkt. No. 90-2) and that "there's a possibility" that Norman, Johnson, and Newell harassed Johnson on the basis of her age or skin tone. (*Id.* at 130:24-133:9.) Chatman admitted in her deposition, however, that she could not cite any facts in support of this "possibility." (*Id.*) This lack of evidence is fatal to Chatman's hostile work environment claim. *See Hoosier v. Greenwood Hospitality Mgmt., LLC*, 32 F. Supp. 3d 966, 979 (N.D. Ill. 2014) ("In order to maintain a claim for hostile work environment under Title VII or the ADEA, the plaintiff must offer evidence that a supervisor or coworker harassed her because of a protected characteristic, such as her race, national origin, gender or age.") (citing *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004)).

Furthermore, none of the conduct about which Chatman complains is sufficiently severe or pervasive to create a legally cognizable hostile work environment. To maintain an actionable claim of hostile work environment, a plaintiff must show that the harassment was both subjectively and objectively "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). Although some of the behavior about which Chatman complains is lamentable, "[m]any employees have to put up with some amount of rude, arrogant, or boorish behavior at work," and the actions of Johnson, Chapman, Norman, and Newell "fall far short of creating an actionable hostile work environment." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment where plaintiff is treated in a "rude, abrupt, and arrogant manner" and is subjected to "stern and severe criticism"). Finally, these activities appear to be too "sporadic,

isolated, and . . . unrelated" to have created a hostile work environment. *Washington v. Am. Drug Stores, Inc.*, 119 Fed. Appx. 3, 4 (7th Cir. 2004).

Accordingly, the Court grants summary judgment in favor of Morgan Lewis on Counts II and VI.

### D. FMLA Claim (Count IX)

Chatman also contends that Morgan Lewis interfered with her rights under FMLA. Under that statute, eligible employees are entitled to 12 workweeks' worth of unpaid leave (*i.e.*, 84 days) in a 12-month period where the absence is caused "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise rights granted under the statute. 29 U.S.C. § 2615(a)(1).

In order to succeed on an FMLA interference claim, a plaintiff must show that "(1) she was eligible for the FMLA protections; (2) her employer was covered by FMLA; (3) she was entitled to take leave under FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). Morgan Lewis concedes that it was covered by FMLA, that Chatman was eligible and entitled to take leave under FMLA, and that Chatman provided sufficient notice of her intent to take FMLA leave. Thus, the only issue before the Court on summary judgment is whether a reasonable jury could find that Morgan Lewis denied Chatman any FMLA benefit. *See James v. Hyatt Regency Chicago*, 707 F.3d 775, 780 (7th Cir. 2013).

Chatman has failed to cite any evidence that Morgan Lewis denied her any FMLA benefit.  Chatman first argues that Morgan Lewis miscalculated her FMLA-protected leave entitlement. (Pl.'s Supp. Mem. at 15, Dkt. No. 158.) But the undisputed facts show that she was unable to work because of her own serious medical conditions during the following time periods:

- May 27, 2010 through June 11, 2010 (16 calendar days);

- June 16, 2010 through July 19, 2010 (34 calendar days);

- December 14, 2010 through December 31, 2010 (18 calendar days); and

- January 3, 2011 through January 18, 2011 (16 calendar days).

(Def.'s SOF ¶¶ 41-42, 44, 46-47, Dkt. No. 91.) These periods total 84 calendar days, which is the number of calendar days protected by the FMLA. Chatman was given written notice that each of these leave periods would be designated as FMLA leave. (*Id.* ¶¶ 41, 42, 44, 47.) Furthermore, Morgan Lewis informed Chatman in a letter dated January 14, 2011 that the period of leave between January 3, 2011 and January 18, 2011 would be designated as FMLA time but any leave after January 18, 2011 would not be protected under the FMLA, and that Morgan Lewis could not guarantee Chatman's return to employment. (*Id.* ¶ 47.) Finally, Morgan Lewis did not begin its search for Chatman's replacement until January 21, 2011, did not offer Chatman's position to a replacement until March 28, 2011, and did not terminate Johnson until April 29, 2011. (*Id.* ¶¶ 52, 53, 57.)

In support of her FMLA claim, Chatman argues that Morgan Lewis failed to comply with their obligation to provide a "designation notice." According to Chatman, Morgan Lewis violated 29 C.F.R. § 825.300(d)(1) by failing to send her a letter within five days after her request for such leave. (Pl.'s Supp. Mem. at 15-17, Dkt. No. 158, citing Pl.'s Ex. 74 at 8, Dkt. No. 147.) Chatman's argument is baseless. The relevant statutory provision states that "[w]hen

the employer has enough information to determine whether the leave is being taken for a FMLA–qualifying reason (*e.g.*, after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances." 29 C.F.R. § 825.300(d)(1). However, the only evidence cited by Chatman is a designation letter dated January 14, 2011 indicating that Morgan Lewis had received Chatman medical information on January 7, 2011. (Pl.'s. Ex. 74 at 1, Dkt. No. 147.) Thus, Chatman's own evidence indicates that Morgan Lewis sent its designation letter five business days after receiving the relevant medical information.

Given the undisputed facts, Chatman has failed to identify a genuine issue of material fact and thus the Court grants summary judgment in favor of Morgan Lewis on Count IX.

## CONCLUSION

For the foregoing reasons, Morgan Lewis's Motion for Summary Judgment (Dkt. No. 90) is granted in its entirety.

ENTERED:

Dated: April 14, 2015

_____
Andrea R. Wood
United States District Judge